Thank you. Good morning. My name is Joel Friedman. I'm an attorney in Phoenix, Arizona. I'm here on behalf of the plaintiff, Mr. Todd Yasuda. I appreciate the opportunity to be here. I would like to reserve two minutes of my ten for rebuttal. This is a case about a person with mental disabilities, mental disorders. The issue is whether they are disabling. And the real legal question is, how do we determine what Mr. Yasuda could and could not do in a workplace? There are two sets of information that were germane to the ALJ's determination of that issue. Information provided by a doctor, a psychologist who examined Mr. Yasuda and filled out a checklist form, and two psychologists who never saw Mr. Yasuda, looked at the psychological evaluation report, answered the same questions in virtually identical ways, and then added two more statements. Dr. Gallucci and Dr. Fair, on their checklist forms, were asked to provide different information. So what you have is a list of things that Mr. Yasuda could not do, and then you have two statements of things that he could do. What we have argued is that the statements by Dr. Gallucci and Dr. Fair are vocational opinions. They took the information from Section 1 of those checklist forms and simply concluded that even with those problems, Mr. Yasuda should be able to work. That's exactly what Dr. Gallucci said. Can you address our Stubbs-Danielson opinion? When I looked at that, it's a little confusing, but it seemed to say that when a doctor translates these moderate pace persistence concentration into a restriction, then the ALJ is entitled to rely on that restriction. In fact, the case seemed very close to this one. So why doesn't that rule apply in this case? So we say the ALJ relied on Drs. Fair and Gallucci translating Dr. — I guess it was House — Dr. House's limitations into work restrictions. There's actually two cases. There's Stubbs-Danielson and there's the Hupai case previously, both of which suggested that according to the POMS, which is the Program Operation Manual System, capital P-O-M-S, that is a sub-regulatory system of interpreting the regulations. So you have the statute, the regulations, and then you have the POMS. The POMS have never been published, and the Ninth Circuit has said that if persuasive, the POMS can be looked at as legal authority. Let's look at the legal authority. The commissioner relies on POMS section DI-24510.060. That is the directions, the mechanics for filling out those checklist forms that Dr. Gallucci and Dr. Fair completed. What the commissioner did not give you is a citation to DI-25020.010, and I apologize because I also didn't find it until recently, but that is a description of what work really involves. And in that POMS section, the two critical areas that were in section 1, maintaining regular attendance and being punctual, and completing a normal workday and workweek, what it says is these tolerances are usually strict, or these requirements are usually strict. So you don't have, from Dr. Gallucci and Dr. Fair, a narrative summary of what's in section 1. You have a vocational interpretation. With those moderate limitations, and keep in mind that moderately limited is not defined on their forms. It is defined on Dr. House's form, and it's defined as having a fair capacity. It's defined as having a limited ability, but the ability to perform the function is not precluded. The only other categories are not significantly limited and markedly limited. So what you have is the middle category that has to represent some range of ability, and the dichotomy that you're asking me about is, it's not illustrated by, it's right in your face from the vocational testimony. If you look at what Dr. Gallucci and Dr. Fair wrote in section 3, Ms. Richter said that Mr. Yasuda would be able to do certain jobs. If you look at her response to the hypothetical that lists the information in section 1, from all three doctors, the vocational testimony was Mr. Yasuda could not perform any work. Those issues are not addressed in Stubbs-Danielson. They are not addressed in Hupai. And with all due respect to those two panels, those decisions are just wrong. That's not how Social Security disability decisions are made. In both of these cases, this is a phrase that I hoped I would never use after I went to law school, graduated from law school, the decisions beg the question. The vocational question is, with moderate levels of impairment in certain functions, can a person work? The Court in Stubbs-Danielson simply concluded that because there was no vocational testimony, the ALJ didn't have to get any additional information and make a decision. Same thing in Hupai. In this case, we have vocational testimony. And that vocational testimony says that with the specific limitations, those limitations that are specified in the POMs in a different section, and I'm more than happy to submit the citation after the argument today, it says that there's no tolerance for those particular categories. Can Mr. Yasuda persevere and concentrate on simple work? Maybe he can. But the rest of Section 1 says he's not going to be able to get to work on a regular schedule. He's not going to get to work on time on a regular schedule. He's not going to be able to stay focused on tasks on a regular schedule. Well, you're providing a translation, right, your own translation of these sections. Absolutely not. That's what those doctors said. He had a moderately severe limitation in the ability to perform activities with a schedule, maintain regular attendance, and be punctual. If moderately limited is not the first category of not significantly limited, then by definition it's a significant limitation of the ability to perform activities within a schedule, maintain attendance, be punctual. That's not really discussed in Section 3 by Dr. Galluzzi or Dr. Fair. The last thing, I have eight seconds. This is also an articulation case. The ALJ didn't say anything about what is obviously a conflict, internal conflict, in those two documents. And that part of the case should not be overlooked and should not be minimized. The judge is required to provide a specific explanation so you can figure out what did she mean. Thank you. Thank you. Good morning. May it please the Court. I am Pamela M. Wood for the Commissioner of Social Security. Appellant is seeking to confuse limitations with residual functional capacity. There is a significant difference. As an example, physical limitations in range of motion, in muscle strength, do not in themselves articulate what an individual with those limitations can still do. Those limitations must be translated into a range of physical work, light, sedentary, whatever it may be, that the individual can still perform. What? Excuse me.  Go ahead. Just as with physical limitations, mental limitations, as we see in psychiatric disorders, difficulties in concentration, in tolerance of workplace changes, in interaction with others, do not in themselves describe what the individual with those limitations can still do. They, likewise, must be translated into a type of work the individual can still do. We have that in this case. Drs. Gallucci and Fair not only summarized the limitations, the mental limitations they found reflected in the record, but they then took that next step and articulated the type of work that Mr. Yasuda could then still do. They both indicated that he could perform sustained work activity. Dr. Fair, in fact, expressly indicated that he had the concentration for, he was able to concentrate for extended periods on simple, unskilled work. It was the ALJ's duty, then, to weigh those opinions for their consistency in the record, and he did so. He found them consistent with the larger objective medical record in this case. And that decision itself is supported by the plethora of favorable mental objective findings provided by Mr. Yasuda's mental health care provider. They found adequate attention and concentration, ability to think, did well on, was able to concentrate well enough to score very well on intelligence testing. These decisions were also supported by the fact that he responded well to treatment with medication and therapy. It was then the ALJ's purview, it was within the purview of the ALJ, to assign a residual functional capacity reflecting all of the limitations he found supported by the record. What you have here, what appellant would have you rely on, is a list of limitations provided to the vocational expert, essentially requiring him to become a medical expert, and translate those into a residual functional capacity, which is not within his expertise or his responsibility. As appellant points out, moderate limitations do not indicate the inability to function in an area. They indicate that an area is affected but not precluded. Again, in this case, Dr. Scalucci and Fair both concluded that Mr. Yasuda was capable of performing sustained work activity. Excuse me. Can I just ask, because I'm not sure I'm following all of your argument, is it not the case that when the VE, the vocational expert, was asked on cross-examination that if the limitations, the moderate limitations that Dr. House articulated were incorporated as part of the limitations, that the vocational expert said that there would be no jobs available on those assumptions? Well, that is the testimony appellant would have you rely on, yes. Our position is that that testimony did not constitute substantial evidence, because it was beyond the vocational expert's purview. He is there solely to advise the ALJ whether jobs exist in significant numbers that an individual with a particular RFC presented to him could perform. His job is not to assess that RFC. Okay, but We have no idea what the vocation, I'm sorry, Your Honor. I take that point, but I'm trying to understand. The ALJ, as I understand it, gave credit to Dr. House. He credited what he, in his medical opinion, Doctor, he credited that. He didn't say, I reject it. In fact, he said he gave it even greater weight. So why wouldn't those limitations be appropriate as medical, medically determined limitations to put into the hypothetical question, and then the V.E. takes that assumption of medical limitation and opines as to whether there would be jobs in the economy. I don't think that would be going beyond what a V.E. does. Yes, Your Honor. I think that's a little bit of misconstruction of what Dr. House did. Dr. House examined Mr. Yasuda, and he provided the list of limitations. The one thing he did not do was establish a residual functional capacity. Now, I think the ALJ relied significantly on the favorable objective medical findings of Dr. House, and he relied on those lists of limitations in that they were similar to that list of limitations found by Drs. Gallucci and Fair. There's some variation. There's going to be, because a lot of this is medical opinion. But they were all three similar. Two of the three established a residual functional capacity, again, that Mr. Yasuda could perform sustained work activity. To that extent, yes, Your Honor. The ALJ relied on Dr. House, and the opinions of Drs. Fair and Gallucci reflect that. Let me just clarify something. Are you saying that the checklist forms where all three doctors, I think, all said that Mr. Yasuda had moderate limitations in pace, persistence, concentration, that was their medical conclusion. Are you saying it's inappropriate for the V.E. to rely on that evidence in determining what jobs are available? It is inappropriate for the V.E. to rely on those, yes. We do not know. First of all, as I said, it is not within his purview to translate that into a residual functional capacity. That is for the ALJ with the assistance of evidence from acceptable forces. Well, that's true. But in constructing the hypothetical, that's the duty of the ALJ to construct an accurate hypothetical based on the medical evidence. I'm sorry. I didn't quite hear your question. No, it's the duty of the ALJ to construct an appropriate hypothetical based on the medical evidence. I don't see that the V.E. was really interpreting that. It was the question is at issue here, not the answer. Well, it is both the question and the resulting response, because the V.E.'s testimony in response to that question does not constitute substantial evidence. And that is the Commissioner's position here. We the the the our regulations expressly in State provide that vocational expert testimony is for occupational rather than medical evidence. And again, this is this is the end of my argument. My time is up. Unless there are any questions. Any further questions? No. Thank you. Thank you. The ALJ relied on the V.E. testimony. She just relied on a different answer. The question is whether the inquiry that resulted in answer A or answer B is the best information. Under the POMS, which the Commissioner insists is relevant here, a person who has a limited tolerance for getting to work can't work, can't perform unskilled work. What we have here is a vocation. The backwards thing is Dr. Fair and Dr. Gallucci taking medical information and saying that a person can work with those problems. Dr. Fair said Mr. Yasuda should be able to sustain work right after he said in the earlier part of the forum that he has significant problems completing a normal work day, completing a normal work week, getting to work on time, getting to work, period. So that is sustained work. It's the ALJ. As I understand the Commissioner's argument, it's the ALJ's function and duty to develop the RFC. And he had three doctors' opinions. They all said the same thing as to the medical issue, moderate, concentration, persistence, whatever. And then two of them translated it into, yes, sustained effort is possible here. So we would have to say that the ALJ was wrong in putting together its RFC. Isn't that the argument you have to make? That is the argument I did make, I thought I was making, or part of it, is that the ALJ's hypothetical is inaccurate, that the RFC that she listed in her decision, which translates all of this other information into just simple, unskilled work. Well, even simple, unskilled work requires a person to get to the job, to stay on task, to finish a day, finish a week. That's what a person who is disabled cannot do. And that's what all three doctors said Mr. Yasuda could not do. And I just would like to refer the Court on the credibility question and reference to Mr. Yasuda's response to treatment. I cited the Ryan case at 528 F. 3rd, 1194. It's a 2008 Ninth Circuit case. That is just flat wrong. That's not an indication of a person not being credible. Thank you. Thank you both for your arguments. The case will be submitted for decision. Mr. Friedman, I noticed that you indicated you might want to give us supplemental information. You can give that to the clerk who will transmit it to us. Thank you. We'll be in recess for ten minutes. All rise.
judges: Thomas, Fisher, Ikuta